STATE, EX REL., GRIEVE v. DISTRICT COURT OF EIGHTH JUDICIAL DISTRICT WITHIN AND FOR NATRONA COUNTY, ET AL.*

(No. 1450; October 17, 1927; 260 Pac. 174)

PROHIBITION—INJUNCTION—POSSESSION OBTAINED BY RESTRAINING ORDER—ORDER DISSOLVING RESTRAINING ORDER—ORDER DIRECTING RESTORATION OF POSSESSION—JUDGMENT—FINDINGS UNNECESSARY TO VALIDITY OF JUDGMENT—ERRONEOUS CONCLUSION NOT AFFECTING COURTS' JURISDICTION.

1. Motion to set aside judgment restoring possession of premises to defendants in injunction suit after temporary injunction had been dissolved, on ground that order of restitution was illegal, since action was neither an action of ejectment nor an action of forcible entry and detainer, *held* to raise question of court's jurisdiction, which is required as condition precedent to granting writ of prohibition.

2. If plaintiff in injunction suit obtained possession of premises, though only in part, through service of temporary restraining order, district court, upon determining and declaring by its judgment that plaintiff had been and was without right to such restraining order, had jurisdiction to direct restoration of premises.

3. Where court, by judgment in suit to enjoin interference with plaintiff's alleged possession of real estate, declared that temporary restraining order be dissolved, petition dismissed, and possession restored, judgment must be taken as showing, in absence of anything to contrary, that court found against plaintiff on issue as to whether

plaintiff acquired possession before restraining order was issued, or whether she acquired possession by means of restraining order.

4. Statement of a finding or findings in a judgment is not necessary to its validity, and a judgment without specific or general finding to support it expressed therein is not void, even though written findings may have been requested.

5. Even if court's conclusion of fact that plaintiff did not acquire possession of premises prior to issuance of temporary restraining order enjoining interference with her alleged possession, but that she acquired possession by means of restraining order, was erroneous, it was a matter to be corrected upon appeal or error, and could not affect court's jurisdiction to enter, as part of judgment dissolving restraining order, an order restoring possession.

*See Headnotes: (1) 32 Cyc. 624 n. 58; (2) 32 C. J. p. 427 n. 73; (3-5) 32 C. J. p. 427 n. 75 New; 33 C. J. p. 1170 n. 37, 38; p. 1195 n. 57; 32 Cyc. p. 617 n. 18.

Original proceeding by the State on the relation of Harriet T. Grieve, for a writ of prohibition against the District Court of the Eighth Judicial District within and for the County of Natrona, and Bryant S. Cromer, Judge, thereof.

*Hagens & Murane* and *Curran & Cobb,* for plaintiff.

*Durham & Bacheller* and *S. E. Phelps,* for defendants.
No briefs filed by either party.

*Per Curiam.*

This is an original proceeding in this court for a writ of prohibition against the district court of Natrona County and the judge thereof. A temporary or conditional writ, usually referred to as an alternative writ, to distinguish it from a writ absolute, was, as authorized by our rules, issued upon the filing and presentation of the petition, commanding the said court and judge to desist and refrain from any further proceedings in the matter complained of until the further order of this court, and, on the date fixed

therein as the answer day, to show cause why said court and judge should not be absolutely prohibited from any such further proceedings.

The temporary writ commanded that a copy thereof, together with a copy of the petition, be served, one upon the said court and the judge thereof, and one upon each of certain defendants in the proceeding sought to be prohibited, viz: The Central Trading Company, the Table Supply Company, each a corporation, and Paul Huber and Alma Huber. An answer was filed herein by the Central Trading Company, denying the illegality of the proceeding sought to be prohibited and alleging that as to errors of law therein, if any, there is an adequate remedy by appeal. A motion was filed on behalf of the court and judge for an order quashing the temporary writ, vacating the order allowing it, and dismissing the petition herein. That motion is, in effect, a demurrer and may be so treated. A separate motion of the Table Supply Company was filed, adopting the said motion of the court and judge.. Upon the issues thus presented, the entire matter has been argued and submitted for final disposition.

The action wherein the proceedings sought to be prohibited occurred or were threatened was brought by Harriet T. Grieve, the relator here, to restrain by injunction Paul Huber, Alma Huber, Central Trading Company and Table Supply Company, from molesting or interfering with her alleged possession of certain described real estate,, and in that action a temporary restraining order was issued and served. After the filing of motions to dissolve that order, and separate answers by the Central Trading Company and the Table Supply Company denying the fact of plaintiff's possession prior to the issuance and service of said order, the cause was heard upon such motions. and also upon the merits; the plaintiff being granted leave, upon her request, to deny generally the averments of said answers and the facts stated in certain affidavits filed in.

support of the motions to dissolve. Upon such hearing oral evidence was also introduced and a transcript thereof is attached to the petition for the writ of prohibition. The court order disposing of the matter directed that the temporary restraining order be dissolved; that the petition be dismissed; that the defendants Table Supply Company and Central Trading Company have and recover their costs; and that the possession of the premises in controversy be restored to the defendant Central Trading Company; such restoration to be made on or before midnight of May 31, 1927. The complaint here refers solely to the order for a restoration of the premises, and further proceedings under that order are what is sought to be prohibited.

The plaintiff below, relator here, filed a motion in said cause to set aside said judgment for the reason that the order of restitution is illegal, since said action is neither an action of ejectment nor an action of forcible entry and detainer, and for the further reason that the court committed errors of law in dismissing the petition. That motion was evidently intended to and did, we think, raise the point of the court's jurisdiction, which, under our decisions, is required as a condition precedent to the granting of a writ of prohibition. State v. District Court, 31 Wyo. 413, 227 Pac. 378. The petition here alleges that the relator, plaintiff in the cause below, was and is a mortgagee in possession after foreclosure, and that the remedy by appeal or petition in error is inadequate; and express reference is made to all of the papers and pleadings in the injunction suit and in the action for the foreclosure of Mrs. Grieve's mortgage.

It is expressly alleged here also that in said foreclosure action a decree was entered in favor of Mrs. Grieve for the amount due upon her mortgage, the exact sum not being alleged, but appears to have exceeded $50,000.00; that said judgment directed an order for the sale of the

premises to issue, and that thereafter, on October 2, 1926, after duly publishing statutory notice of sale, the said premises were sold by the sheriff to the relator for $40,000.00; that the sale was confirmed, and, upon the expiration of the redemption period, that the premises were conveyed to the relator by sheriff's deed, which was duly recorded on April 26, 1927. It is further alleged that the relator thereupon demanded possession of the premises, which demand was refused, and that, on April 30, 1927, she took "quiet and peaceable possession" thereof. And it appeared that on that date, also, the temporary restraining order was issued and served, the alleged taking of possession and the service of the restraining order occurring on the evening of that date between nine and 10:30 or eleven o'clock; the order in which said events occurred being a matter in dispute.

It might be said, indeed, that the order in which said events occurred is the only matter of fact in dispute for consideration in this proceeding. That Mrs. Grieve finally obtained exclusive possession on the evening of April 30 is not disputed. But that she did so before the service of the restraining order is disputed, and that any such possession as she had or was claiming to have prior to that service was peaceable is disputed by the pleadings both in this proceeding and in the injunction suit; and upon the evidence in the injunction suit that was a matter to be determined as a mixed question of fact and law.

Each of the answers in said suit—the answer of the Table Supply Company, who claimed to have been a tenant in actual possession of the premises, and the answer of the Central Trading Company, claiming to have been the legal title holder of the premises and in possession through its tenant, the Table Supply Company, not only denied plaintiff's possession prior to said service of the restraining order but alleged that she was prior thereto attempting to take forcible possession of the premises and that they

were resisting the same. Each of said answers contained a prayer that upon the dissolution of the restraining order the possession of the premises be restored to said answering defendant. And thus the issues were presented whether prior to the issuance and service of the restraining order the plaintiff had any possession of the premises except such as had been forcibly acquired, and whether even that possession was obtained otherwise than by the use and assistance of the restraining order.

The oral evidence explains the ownership and occupancy of the premises from the time the defendants in the injunction suit became connected therewith until and including the events of April 30, 1927, when the alleged change of possession occurred. It may be summarized as follows:

Prior to August 6, 1923, the relator was the owner of the premises in question, consisting of four lots on a corner of a platted block, including an area of 100 by 100 feet, in what we understand to be a part of the business section of the city of Casper. On that date she sold and conveyed the property to Mr. Paul Huber, taking a mortgage back from him and his wife for $50,000 to secure promissory notes aggregating that amount, providing for yearly payments on the principal of either $2500 or $3500, except the last payment, which was for the sum of $500; the mortgage and notes fixing August 16, 1924, as the date for the first payment, and the same date of each subsequent year until and including August 16, 1943, for the remaining annual payments. The first payment provided for was the only one made; and it appears also that the mortgagors had not paid any of the taxes assessed against the property, which seems to have approximated the sum of $6000 at the time of the trial. Mr. Huber eventually erected upon the property a one-story brick building covering the entire area of the lots, evidently removing buildings formerly there, for there had been tenants and relator, it appears,

had a house on the premises, and she testified that she had been accustomed to an independent income from the property. On August 15, 1924, Huber and his wife conveyed the property for a stated consideration of one dollar and other valuable considerations to the Central Trading Company. Prior to that conveyance the property was occupied by different tenants, with the business concerns of whom Mr. Huber had no interest except possibly one or two; his testimony mentioning "The Exchange Furniture Company" as one of the companies in which, we understand, he may have been interested and which had some property remaining in the building at the time of the difficulty giving rise to the present proceeding. The Central Trading Company was organized as a corporation about the time of and prior to the conveyance of the property to it, and its directors were Paul Huber and Alma Huber, the mortgagors, and Emerich Huber; and Paul Huber was president of the company. That company, some time in 1925, executed a lease of the new building to the Table Supply Company, a concern apparently organized to deal in groceries, meats, vegetables, fruits, and other articles of merchandise unnecessary to mention, which lease provided for the payment of $750 per month as rent up to "a certain time" and then $1000 per month for the remainder of the time. The directors of the lessee company were Emerich Huber, Alma Huber and John Huber; Paul Huber not holding any stock in the company but being employed as general manager thereof from the time that its business was started. The action to foreclose the mortgage brought by the relator resulted in a decree in her favor and in a sheriff's sale and deed, as above stated, the date of the said judgment and decree being alleged in the petition as August 27, 1926.

On the evening of Saturday, April 30, 1927, at nine o'clock or thereabouts, the relator went to the premises accompanied by one of her attorneys and by four or five

other men, the latter being provided with "padlocks or hasps" as described in the evidence; each of the latter taking a position at one of the entrance doors and proceeding immediately to attach his padlock or hasp or both to the door, which was accomplished and the doors thereby locked from the inside, each of said parties remaining in charge of the door for a time at least, if not during the remainder of the evening. Another of her attorneys seems to have been there at some time during the evening. At approximately the same time, nine o'clock, the relator met Mr. Paul Huber in the store and informed him that she had come to take possession of the premises, and she gave that information also to one or two of the employees in the building.

It appears that there were in the building at that time several customers, in addition to the clerks and employees of the Table Supply Company, the number being variously estimated by the witnesses, but the exact or approximate number is apparently immaterial. Such customers, as they finished their trading, were allowed to leave through one of the doors which was kept guarded while the other doors remained continually locked. Then, as the closing hour of 9:30 approached, the number of clerks gradually dwindled, they being allowed to depart the same way until only two or three remained, no one having been allowed to enter after the doors were locked, except as hereinafter stated. Mr. Huber, the manager of the Table Supply Company and generally referred to by other employees thereof who testified in the injunction suit as the one who employed them, attempted at one time to interfere with the guarding of one of the doors, resulting in a slight scuffle, whereupon the chief of police was called, who, upon request, arrested Mr. Huber and said door guard, and they were taken to the city hall or jail, but after posting bonds were allowed to return to the premises, although Mr. Huber was not allowed to enter for some little time there-

after. In the meantime, he left and later returned with the sheriff and his deputy, the latter in possession of some warrants, described as ''John Doe Warrants,'' which had been secured by Mr. Huber, apparently for the arrest of relator or her assistants. The sheriff as well as Mr. Huber then demanded admittance but upon being refused the sheriff or his deputy broke in a door, and shortly if not immediately thereafter Mr. Huber was also admitted, together with his attorney, who had come there at his request. Although one or two arrests were made by the sheriff, he testified that there was no particular disturbance or breach of the peace while he was there. The only persons remaining in the building at that time other than Mr. Huber and his attorney, the sheriff and his deputies, the relator and her attorneys and such of her assistants at the doors as may have remained, were, as Mr. Huber testified, Mrs. Huber, and two of his daughters, described by him respectively as his ''little baby'' and his ''bigger daughter,'' the bookkeeper and someone named Thompson, who may have been an employee. A little later he named as then present Mrs. Huber, Mr. McChaley, Mr. Porter and Mrs. Thompson. After Mr. Huber, his attorney, the sheriff and his deputy were admitted, and while the doors were locked and the main door guarded by one of relator's assistants, one of her attorneys returned from a temporary absence, having in his possession the restraining order, which was then served upon Mr. Huber. There was then some discussion as to removing the merchandise and other property of the Huber corporations, but apparently without any complete understanding that evening as to the date of such removal, though relator insisted that they be removed not later than Monday. Before the parties separated, Mr. Huber, through his attorney, following the service of the restraining order, served upon the relator a notice to quit the premises, and later he and his attorney left the building.

In this proceeding, then, the question is whether the District Court, a court of original general jurisdiction, had jurisdiction, upon the hearing of the motions to dissolve the temporary restraining order and upon the merits, not only to dissolve such order and dismiss the petition, but to direct a restoration of the premises. The decision denied the right of plaintiff to either permanent or temporary injunctive relief, and there is no complaint in this proceeding of the court's action in that respect. But it is contended that said court was without jurisdiction to proceed further by deciding who was then entitled to possession, and grant relief accordingly. It is contended, on the other hand, by counsel for defendants in said injunction suit, who represent also the court and judge in this proceeding, that the relator's possession was obtained, not only unlawfully by forcible intrusion upon the possession of said defendants, but through the issuance and service of the temporary restraining order; and that the District Court was therefore authorized to direct a restoration of the premises, to avoid the inequitable result of the use of the restraining order to obtain possession. It will be remembered that the answers in the injunction suit tendered that issue and prayed for such restoration. And in support of the contention of said counsel upon that issue, authorities have been cited seeming to sustain the court's jurisdiction upon the grounds aforesaid. Before we proceed to a review of such authorities and others, it should be stated that counsel for relator do not agree that the evidence shows a possession acquired by her, either wholly or in part, through the use of the restraining order. But they maintain that her possession was complete before the service or the granting of such order.

Briefs were not filed upon the hearing, but lists of authorities referred to in the oral argument were left with us, and one of the cases thus cited by counsel for the defendants in this proceeding is L. S. & M. S. Ry. Co. v.

Taylor, 134 Ill. 603. It appeared in that case that the two parties were claiming title adversely to each other to a strip of ground, and that one of them, the appellant, caused a fence to be built so as to place the strip within appellant's enclosure. Thereupon appellee filed a bill alleging ownership and present possession of the strip, threats of appellant to invade her possession and praying an injunction enjoining appellant from invading her possession and from building a fence enclosing the strip within appellant's enclosure. The injunction was issued, and at or about the same time appellee commenced tearing down the fence built by appellant, as aforesaid, and later, on the same day, completed the tearing down thereof. Later in the year, appellee caused another fence to be built, so as to enclose the strip in dispute with other real estate claimed by her. The trial court, upon the hearing, ordered the injunction dissolved and that a writ of restitution issue restoring the possession to appellant. On appeal to the Supreme Court from the intermediate appellate court, which had reversed so much of the judgment as awarded a writ of restitution, the said Supreme Court stated its conclusion as follows:

"Since the wrong which appellee sought to have avoided by the injunction had been done before her bill was filed, and she knew it, the preliminary injunction was improvidently granted, and it was therefore properly dissolved on the hearing. (Wangelin v. Goe, 51 Ill. 459; People v. Siwanson, 10 Mich. 335.) The injunction became operative, not merely from the moment the writ was issued, but from the moment it was ordered by the circuit judge. (High on Injunctions, sec. 382.) After that order was made, appellee could have prevented appellant from doing any act forbidden by it, by simply giving appellant actual notice of the existence of the order. * * * Necessarily, therefore, as well when appellee caused the fence to be torn down as when she afterwards caused her fence to be built, she was protected against any interference by appellant, by the order of the judge granting the injunc-

tion. Appellant's hands were, as to her, during all of that
time, tied, so that appellant could, by no possibility, do
any legal act in assertion of its claim of ownership or right
of possession. The only function of an injunction is to
stay threatened action, and suspend the conflicting claims
of right of the respective parties where they then are,
until they can be properly adjudicated. (2 Daniell's Ch.
Pr., 5th ed., 1639, and note.) And so it must necessarily
follow, that to allow one party to obtain any advantage by
acting when the hands of the adverse party are thus tied
by the writ or the order for it, is an abuse of legal process
which cannot be tolerated. It is immaterial here in whom
is the legal title, or whether, when appellant built its
fence it was a trespasser or lawfully in possession—those
questions can not be determined here. It is sufficient, for
the present, that appellee, after having tied the hands of
appellant as to the assertion of its claim of right, and
while they were so tied, has changed the *status quo* of the
parties in this respect. She must restore things to the
same plight and condition, as nearly as possible, in which
they were when the judge made the order upon her bill
that an injunction issue.''

And thereupon the judgment of the lower appellate
court was reversed so far as it modified the decree of the
trial court and in other respects affirmed.

In Little Rock Ry. & Elec. Co. v. North Little Rock, 76
Ark. 48, 88 S. W. 826, also cited by defendants, where an
injunction had been granted to preserve the *status quo* of
two municipalities, pending an appeal to determine wheth-
er or not the proceedings for the annexation of a part of
one to the other were valid, the Chief Justice, writing the
opinion, referred to the holding by Lord Chancellor Eldon
in Pultenay v. Warren, 6 Vesey Jr., Chan. 73, that where
a party obtained an injunction preventing his adversary
from pursuing and enjoying rights, and the injunction
was finally dissolved, the party could not take advantage
of any rights which he had thus wrongfully prevented
his adversary from enjoying, and then said:

"This principle has found secure lodgment in equity jurisprudence, and is applied to varying kinds of cases involving its application. Frequently it is applied when an injunction stays an action and it becomes barred or right of execution lapses; and in many other cases, when an injunction wrongfully prevents the assertion of a right or causes it to lapse, then the court treats the plaintiff wrongfully causing this effect to be reciprocally bound by the injunction."

C. L. P. Co. v. Seaboard Ry. Co., 88 S. C. 464, 71 S. E. 34, is another case cited, from which we quote only the next to the last paragraph of the opinion:

"We do not deem it important or necessary to consider all the exceptions in detail, as the foregoing considerations are sufficient to justify reversal of the order under consideration. We regard it also proper to provide for the restoration of the status as it existed on December 22, 1910, when plaintiff secured the restraining order against defendant, as it was inequitable to leave plaintiff free to disturb the status, after tying defendant's hands. 1 High on Inj. (4th Ed.) Sec. 5a; 10 Enc. Pl. & Pr. 1104; Railway Co. v. Taylor, 134 Ill. 603, 25 N. E. 588."

Brown v. Donnelly, 19 Okla. 296, 91 Pac. 859, does not appear to have been cited by counsel, but it is quite in point. We quote from the opinion the following as sufficient to explain the application of the case here:

"The order made by the trial court, dispossessing the defendant and enjoining her from interfering with the plaintiff in his occupancy of the land so taken away from her, was in excess of its authority. (Black v. Jackson, 177 U. S. 349, 20 Sup. Ct. 648, 44 L. Ed. 801.) And it was just and equitable that the defendant be restored to the possession of the land which had been taken from her and given to the plaintiff. It was the duty of the judge to give back to the defendant that which the court had erroneously taken away from her in this same action."

In Tex. L. & Irr. Co. v. Sanders, 101 Tex. 616, 111 S. W. 648, what was termed a mandatory injunction was issued, requiring the delivery to appellant of a certain portion of a crop of rice, which was complied with by the parties against whom the writ was issued by the delivery of rice amounting in value to more than $1,000. Thereafter, the suit was dismissed, and in the same order, judgment was rendered against the appellant, to whom the rice had been delivered under the mandatory injunction, for the value of the rice so delivered. In disposing of the objection to that action of the court, the Supreme Court of Texas said, answering the submitted questions, Did the court have jurisdiction to render judgment against appellant? Was the judgment properly rendered against appellant under the facts stated?:

"Although the court had no jurisdiction to try the original suit, yet, having entered an order in that suit whereby the plaintiff acquired the possession of property which belonged to or was in the possession of the defendants therein, the court that committed the error by issuing the mandatory injunction had jurisdiction to restore the property wrongfully taken to the possession of the persons from whom it was so taken." Citing, among other authorities, N. W. Fuel Co. v. Brock, 139 U. S. 216, 11 Sup. Ct. 523, 35 L. Ed. 151; Railway Co. v. Taylor, 134 Ill. 603, 25 N. E. 588; Brown v. Van Cleave, (Ky.) 21 S. W. 756; Ex parte Morris & Johnson, 9 Wall 605, 19 L. Ed. 799. "The county court, having authority, and it being its duty, to make restitution to the defendants in the original suit of that which had unlawfully been taken from them, had the power and in the exercise of that authority correctly entered judgment against the plaintiff in that proceeding for the value of the property which had been taken and appropriated by it."

In a case which we think was cited by one of the parties, Van Zandt v. Argentine Mining Co., 2 McCrary 642, a

preliminary injunction had been granted, restraining the defendant from taking ore from a mine or from disposing of any such ore pending the suit; defendant having been in possession prior to the allowance of the injunction and there having been no order to disturb its possession. But after the allowance and service of the writ the complainant took possession of the mine, ejecting defendant's agents therefrom. And upon application to the court, and proof of said latter fact, an order was issued requiring complainant to restore the possession to the defendant and to abstain from any interference therewith pending proceedings in the cause. The court, by McCrary, Circuit Judge, said:

"Where, as in this case, the evident purpose of the writ is to preserve the existing status of the property in litigation until a final adjudication can be had, it is a gross abuse of the process of the court for the complainant to disregard his own injunction, after having by means thereof tied the hands of his adversary, and no doubt the court has ample power to prevent or redress such abuse. In this case the court did redress it by ordering the plaintiff to restore the property to defendant and to abstain from any further interference with the possession thereof pending the suit."

In Fuel Co. v. Brock, 139 U. S. 216, 35 L. Ed. 151, one of the cases cited in the Texas case of L. & Irr. Co. v. Sanders, the same principle was applied to facts disclosing a somewhat different situation: Where the judgment of the trial court was reversed because of a lack of jurisdiction, and said court thereupon entered judgment for restitution of money collected on the reversed judgment. The Supreme Court stated the situation as follows: The gist of the whole complaint is that the reversal by this court being for want of jurisdiction in the Circuit Court—such jurisdiction not affirmatively appearing—that court had no authority to act further in the matter than as directed by

the mandate, which went only to the reversal of its judg-
ment and the collection of the costs incurred in the appel-
late court. And thereupon the Supreme Court, through
Mr. Justice Field, said:

"This position is supposed to be supported by those de-
cisions which hold that when a case is dismissed for want
of jurisdiction in the Circuit Court to entertain the action,
or render the judgment entered, the power of that court
to award costs is gone. * * * But here the jurisdiction
exercised by the court below was only to correct by its
own order, that which, according to the judgment of its
appellate court, it had no authority to do in the first in-
stance; and the power is inherent in every court whilst
the subject of controversy is in its custody, and the parties
are before it, to undo what it had no authority to do orig-
inally, and in which it, therefore, acted erroneously, and
to restore, as far as possible, the parties to their former
position. Jurisdiction to correct what had been wrong-
fully done must remain with the court so long as the
parties and the case are properly before it, either in the
first instance or when remanded to it by an appellate tri-
bunal. The right of restitution of what one has lost by
the enforcement of a judgment subsequently reversed has
been recognized in the law of England from a very early
period, and the only question of discussion there has been
as to the proceedings to enforce the restitution." Citing,
2 Salkeld 588; Bank v. Bank, 6 Pet. 817; Tidd's Prac. 936,
1130-8; Morris' Cotton, 8 Wall. 507; Ex parte Morris, 9
Wall. 605; Hiler v. Hiler, 35 O. S. 645; Chamberlain v.
Choles, 35 N. Y. 477. "We are of opinion that the proceed-
ing to enforce the restitution in the case mentioned is
under the control of the court, * * * the only requisite
being that the opposite party shall be heard, so that in
directing restitution no further wrong be committed."

The fact is interesting that appended to the court's said opinion are the following remarks by Brewer, J., in which Brown, J., concurred:

"I had supposed the law to be otherwise, and that if the Circuit Court did not have jurisdiction by reason of a lack of proper citizenship of the parties to render a judgment in favor of the plaintiff against the defendant, it was equally without jurisdiction thereafter in the same case and without any change in the citizenship to render a judgment in favor of the defendant against the plaintiff. But the result is so manifestly equitable, I am glad to know that I was mistaken, and that the law is as it is now adjudged to be."

We think the principle stated and considered in the above cited cases must be held to be controlling in the case at bar; so that, if it appears that plaintiff's possession, upon which was predicated the right to injunctive relief to prevent interference therewith, was obtained through or as the effect of the granting or service of the restraining order, though only in part, the District Court would have jurisdiction to direct a restoration of the premises upon determining and declaring by its judgment that the plaintiff had been and was without right to such restraining order.

There is neither a general finding nor specific findings expressed in the judgment as entered in the injunction suit. But immediately following the recital therein that the court had proceeded to hear the evidence of all parties upon the motions to dissolve and upon the merits, and "being now fully advised in the premises," appear the directions heretofore mentioned, namely, that the temporary restraining order be dissolved, that the petition be dismissed, that the defendants recover their costs, and that the possession of the premises be restored to the Central Trading Company, and that such restoration be made on or before midnight of May 31, 1927. And as a part of

the certified transcript of the evidence and proceedings upon the trial of the injunction suit prepared by the official court reporter, and attached to the petition for a writ of prohibition, are certain oral remarks of the court reported as occurring immediately at the conclusion of the arguments in the cause, among which appear the following, which we quote:

"The bone of contention * * * is that possession was obtained in the evening of April 30th, prior to the time the injunctional order was served * * *. It is doubtful, in my opinion, that the facts in evidence would prove a possession by the mortgagee. If it was, or could be called, possession, it was not the sort of possession upon which the mortgagee can predicate rights. That is, the possession was not exclusive, and the plaintiff exercised no dominion over the premises until after the injunctional order was served. Our notions of the law, however, relieve us from a close discussion of the facts as to whether the mortgagee actually obtained possession, for the reason that under the law of this state, as we deem it to be, such so-called possession as she obtained was unlawful. The judgment in the case will be in favor of defendant, Central Trading Company, and restores possession of the premises to that defendant. The temporary restraining order is dissolved upon the motion in this case."

While we do not suppose that those remarks, intended to state informally the court's views of the case, can be regarded as "findings," for they are not so entitled and do not appear to have been entered as such, they do at least show what was understood by the court to be the issues in the case respecting plaintiff's possession, and that involved therein was the question of fact whether such possession had been wholly acquired before the granting, or the notice of the granting, of the restraining order. And if that might have any effect upon the decision in this proceeding, it would tend to show that the trial court, upon disposing of the injunction suit, had considered said

issue and found adversely to the plaintiff upon that question.

But we think it is not necessary to rely upon those remarks in disposing of the matter before us in this proceeding. Having plainly declared by its judgment that the restraining order be dissolved, the petition dismissed, and the possession restored it must be taken, we think, in the absence of anything to the contrary, as showing that the court found in favor of the defendants and against the plaintiff upon the issue as to the time when her possession had been acquired; that is to say, whether before or after the granting of the restraining order or the notice thereof. The statement of a finding or findings in a judgment is not necessary to its validity, that is to say, a judgment, without a specific or general finding to support it expressed therein, is not void—even though written findings may have been requested. But, if objectionable at all for the absence of findings, it would be merely an irregularity or error for which the judgment might be vacated or reversed upon proper proceedings for that purpose, as held by this court in School District v. Western Tube Co., 13 Wyo. 304, 80 Pac. 155. And if the court's conclusion upon the facts as to the time, with reference to the restraining order, that possession was acquired is erroneous, it is a matter to be corrected upon appeal or error, and could not affect the court's jurisdiction to enter, as a part of the judgment, an order restoring possession.

It follows that the objections to the issuance of a writ of prohibition must be sustained, and the petition therefor dismissed. It will be so ordered.

*Dismissed.*